**BRODSKY SMITH, LLC**
Evan J. Smith (SBN 021271996)
emith@brodskysmith.com
Ryan P. Cardona (SBN 093162013)
rcardona@brodskysmith.com
1310 Kings Highway N.
Cherry Hill, NJ 08034
Tel.:    (856) 795-7250
Fax:    (856) 795-1799

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| CODY CROWDER,<br><br>                   Plaintiff,<br><br>          vs.<br><br>OYSTER POINT PHARMA, INC., DONALD J. SANTEL, JEFFREY NAU, MICHAEL G. ATIEH, ALI BEHBAHANI, MARK MURRAY, CLARE OZAWA, BENJAMIN TSAI, AIMEE WEISNER, and GEORGE ELIADES<br><br>                   Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1) Violation of § 14 (e) of the Securities Exchange Act of 1934<br>(2) Violation of § 14 (d) of the Securities Exchange Act of 1934<br>(3) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Cody Crowder ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.      Plaintiff brings this stockholder action against Oyster Point Pharma, Inc. ("Oyster Point" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with the Company, the "Defendants"), for violations of Sections

14(e), 14 (d), and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to sell the Company to Viatris Inc. ("Parent") through merger vehicle Iris Purchaser Inc. ("Merger Sub", collectively with Parent, "Viatris") as a result of an unfair process, and to enjoin an upcoming tender offer on a proposed all cash transaction (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a November 7, 2022, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, Viatris will acquire all the outstanding shares of Oyster Point common stock for $11.00 per share in cash as well as a Contingent Value Right entitling the holder to up to $2.00 per share if certain milestones are achieved. As a result, Oyster Point will become an indirect wholly-owned subsidiary of Viatris.

3.      Thereafter, on December 1, 2022, Oyster Point filed a Solicitation/ Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC in support of the Proposed Transaction.

4.      The Proposed Transaction is unfair for a number of reasons.  Significantly, the Recommendation Statement describes an insufficient process with only one goal in mind – to sell the Company to Viatris.

5.      Notably, the Recommendation Statement fails to disclose whether a committee of disinterested directors was appointed to manage the sales process, and if so, what powers that committee had in reviewing the Proposed Transaction, including whether the committee had the ability to veto a potential transaction that was not in the best interests of shareholders.

6.      Next, it appears as though the Board has entered into the Proposed Transaction to procure for itself and senior management of the Company significant and immediate benefits with no thought to Plaintiff as a public stockholder.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.

7.      In violation of the Exchange Act, Defendants caused to be filed the materially deficient Recommendation Statement with the SEC in an effort to solicit stockholders, including Plaintiff, to tender their Oyster Point shares in favor of the Proposed Transaction.  The Recommendation Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to tender in favor of the Proposed Transaction, and is thus in violation of the Exchange Act.  As detailed below, the Recommendation Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Oyster Point, provided by Oyster Point to the Company's financial advisors Centerview Partners LLC ("Centerview"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions created by Centerview and provided to the Company and the Board.

8.      Accordingly, this action seeks to enjoin the Proposed Transaction.

9.      Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.  This action seeks to enjoin the Proposed Transaction.

## PARTIES

10.     Plaintiff is a citizen of Louisiana and, at all times relevant hereto, has been an Oyster Point stockholder.

11.     Defendant Oyster Point a commercial-stage biopharmaceutical company, focuses on the discovery, development, and commercialization of pharmaceutical therapies to treat ophthalmic diseases in the United States. Oyster Point is incorporated in Texas and has its principal place of business at 202 Carnegie Center, Suite 109, Princeton, New Jersey.  Shares of Oyster Point common stock are traded on the Nasdaq Stock Exchange under the symbol "OYST".

12.     Defendant Donald J. Santel ("Santel") has been a Director of the Company at all relevant times.

13.     Defendant Jeffrey Nau ("Nau") has been a director of the Company at all relevant times.

14.     Defendant Michael G. Atieh ("Atieh") has been a director of the Company at all relevant times.

15.     Defendant Ali Behbahani ("Behbahani") has been a director of the Company at all relevant times.

16.     Defendant Mark Murray ("Murray") has been a director of the Company at all relevant times.

17.     Defendant Clare Ozawa ("Vrabely") has been a director of the Company at all relevant times.

18.     Defendant Benjamin Tsai ("Tsai") has been a director of the Company at all relevant times.

19.     Defendant Aimee Weisner ("Weisner") has been a director of the Company at all relevant times.

20. Defendant George Eliades ("Eliades") has been a director of the Company at all relevant times.

21. Defendants identified in ¶¶ 12 - 20 are collectively referred to as the "Individual Defendants."

22. Non-Party Parent operates as a healthcare company worldwide. The company operates in four segments: Developed Markets, Greater China, JANZ, and Emerging Markets. It offers prescription brand drugs, generic drugs, complex generic drugs, biosimilars, and active pharmaceutical ingredients (APIs). Viatris trades on the NasdaqGS under the symbol "VTRS."

23. Non-Party Merger Sub is a wholly owned subsidiary of Viatris created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e), 14 (d), and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

25. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its principal offices within the district.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

27.     Oyster Point Pharma, Inc., a commercial-stage biopharmaceutical company, focuses on the discovery, development, and commercialization of pharmaceutical therapies to treat ophthalmic diseases in the United States. The company's product candidate is TYRVAYA, a nicotinic acetylcholine receptor agonist for the treatment of signs and symptoms of dry eye disease. It is also developing TYRVAYA that is in Phase II clinical trial for the treatment of for neurotrophic keratopathy. The company was incorporated in 2015 and is headquartered in Princeton, New Jersey.

28.     The Company's most recent financial performance press release, revealing financial results from the quarter preceding the announcement of the Proposed Transaction, indicated impressive financial success.  For example, in the August 11, 2022 press release announcing its 2022 Q2 financial results, the Company reported that it had conducted key strategic objectives by expanding patient access to TYRVAYA, with Medicare Part D access expected by Q4 of 2022, and as early as September 2022. Further, the Company announced a new operating expense streamlining plan to maximize commercial potential of TYRVAYA and create value for shareholders.

29.     Speaking on the results, CEO Defendant Nau said, "We steadily grew TYRVAYA's footprint in the dry eye market, with expanded patient access and over 30,000 prescriptions written during the quarter. While our commercial team focused on increasing

adoption of TYRVAYA, we also made significant progress across multiple areas of the business including collaborating with licensing partner Ji Xing Pharmaceuticals to enroll the first patients in the first Phase 3 trial of OC-01 outside of the U.S., continued enrollment of our OLYMPIA Phase 2 clinical trial for neurotrophic keratopathy and the submission of a Pre-IND meeting request to the U.S. FDA for our Enriched Tear Film gene therapy platform."

30.     The promise and financial results are not an anomaly, but rather, are indicative of a trend of continued future potential success by Oyster Point.  Clearly, based upon the positive outlook, the Company is likely to have tremendous future success.

31.     Despite this upward trajectory, the Individual Defendants have caused Oyster Point to enter into the Proposed Transaction without providing requisite information to Oyster Point stockholders such as Plaintiff.

***The Flawed Sales Process***

32.     The Recommendation is materially deficient. The Recommendation Sheet fails to disclose whether a committee of disinterested directors was appointed to run the sale process, and if so, the specific powers that committee had in evaluating a potential transaction.

33.     The Recommendation Statement fails to disclose adequate reasoning as to why the board agreed to uncertain forms of consideration through a CVR rather than a more definite form of consideration such as a higher purchase price.

34.     Moreover, the Recommendation Statement fails to disclose proper reasoning as to why the Board failed to protect the interests of public stockholders of the Company by implementing a "majority-of-the-minority" provision in light of the fact that approximately 46% of the outstanding voting stock of the Company has already been locked up in tender and support agreements in favor of the Proposed Transaction.

35.     In addition, the Recommendation Statement is silent as to the nature of the confidentiality agreements entered into between the Company and potentially interested third parties, including Viatris, throughout the sales process, if any, and whether these agreements differ from each other, and if so in what way.  The Recommendation Statement also fails to disclose all specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and any potentially interested third parties, including Viatris, throughout the sales process, if any, would fall away.

36.     It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

***The Proposed Transaction***

37.     On November 7, 2022, Oyster Point issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**PRINCETON, N.J., Nov. 07, 2022 (GLOBE NEWSWIRE) --** Oyster Point Pharma, Inc. (Nasdaq: OYST), ("Oyster Point Pharma"), today announced that it has entered into a definitive agreement under which Viatris Inc. (Nasdaq: VTRS), a global healthcare company, would acquire Oyster Point Pharma, a commercial-stage biopharmaceutical company focused on the discovery, development and commercialization of first-in-class pharmaceutical therapies to treat ophthalmic diseases. Viatris intends to acquire Oyster Point Pharma as the foundation of its new ophthalmology franchise, recognizing its uniquely talented team, the strength of TYRVAYA® (varenicline solution) Nasal Spray and Oyster Point Pharma's pipeline.

Under the terms of the agreement, Viatris will commence a tender offer to purchase all outstanding shares of Oyster Point Pharma for $11.00 per share in cash at closing, plus a contingent value right ("CVR") for a potential cash payment of up to $2.00 per share upon achievement of specified performance targets by Oyster Point Pharma for full year 2022.

The transaction was unanimously approved by the Oyster Point Pharma Board of Directors.

"Oyster Point Pharma brings to Viatris the strength of TYRVAYA Nasal Spray, the first and only FDA-approved nasal spray for dry eye in the U.S., an eye care

focused pipeline, and a very experienced team that possesses extensive knowledge of the ophthalmology space from a clinical, medical, regulatory and commercial perspective," said Michael Goettler, chief executive officer of Viatris. "Together, we believe we are setting the foundation for the next global ophthalmology leader, accelerating efforts to address the unmet needs of patients with ophthalmic disease and the eye care professionals who treat them, and positioning Viatris for growth."

"We are pleased to announce Viatris' proposed acquisition of Oyster Point Pharma, recognizing the exciting opportunities that lie ahead of us," said Jeffrey Nau, Ph.D., MMS, president and chief executive officer of Oyster Point Pharma. "Through our efforts to license our innovations globally, we recognized that Viatris would be an optimal partner with its Global Healthcare Gateway. With Viatris' global capabilities and commitment to ophthalmology, we expect to be able to expand TYRVAYA's impact on the dry eye landscape and accelerate our exciting pipeline. With our combined sector expertise, innovation, scale, pipeline and global commercial reach, we expect to build a world-class ophthalmology business to meaningfully shape the future of eye care, to the benefit of patients."

In November 2021, Oyster Point Pharma launched TYRVAYA, the first and only FDA-approved nasal spray for the treatment of the signs and symptoms of dry eye disease. In addition, Oyster Point Pharma has a growing pipeline of clinical and pre-clinical programs aimed at delivering transformative innovation for ocular surface diseases. In addition to TYRVAYA, Oyster Point Pharma has three drug candidates in its pipeline: two investigational therapies for neurotrophic keratopathy, a severe degenerative condition affecting the nerves of the cornea, and another for vernal/atopic keratoconjunctivitis, a severe allergic condition of the eyes.

*Potential Conflicts of Interest*

38.     The breakdown of the benefits of the deal indicates that Oyster Point insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Oyster Point.

39.     Company insiders, currently own large, illiquid portions of Company stock all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company.

| Name of Executive Officer or Director | Number of Shares Beneficially Owned (#) | Cash Consideration for Shares ($) | Implied CVR Consideration for Shares ($) |
|---|---|---|---|
| Jeffrey Nau, Ph.D., M.M.S. | 110,677 | $ 1,217,447 | $ 221,354 |
| Daniel Lochner | 59,547 | $ 655,017 | $ 119,094 |
| Michael G. Atieh | 18,083 | $ 198,913 | $ 36,166 |
| Ali Behbahani, M.D. | 10,066 | $ 110,726 | $ 20,132 |
| George Eliades, Ph.D. | 11,761 | $ 129,371 | $ 23,522 |
| Mark Murray | 118,513 | $ 1,303,643 | $ 237,026 |
| Clare Ozawa, Ph.D. | 11,064 | $ 121,704 | $ 22,128 |
| Donald Santel | 5,489 | $ 60,379 | $ 10,978 |
| Benjamin Tsai | 10,066 | $ 110,726 | $ 20,132 |
| Aimee Weisner | 33,191 | $ 365,101 | $ 66,382 |
| All of the current directors and executive officers as a group (10 persons) | 388,457 | $ 4,273,027 | $ 776,914 |

40.     Notably, Company insiders, currently own large, illiquid portions of stock options, restricted share, or other equity award, which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction as follows:

| Name of Executive Officer or Director | Number of Shares Underlying Vested Oyster Point Options (#) | Vested Oyster Point Option Exercise Price ($) | Closing Amount Payable for Vested Oyster Point Options ($) | Maximum CVR Amount Payable for Vested Oyster Point Options ($) | Number of Shares Underlying Vested Oyster Point RSUs (#) | Closing Amount Payable for Vested Oyster Point RSUs ($) | Maximum CVR Amount Payable for Vested Oyster Point RSUs ($) | Total Closing Value ($) | Total Maximum CVR Value ($) |
|---|---|---|---|---|---|---|---|---|---|
| Jeffrey Nau, Ph.D., M.M.S. | 794,235 | $2,302,808 | $6,433,777 | $1,588,470 | — | — | — | | |
| Daniel Lochner | 127,594 | $1,468,607 | $ 0 | $ 190,115 | — | — | — | $ 0 | 190,115 |
| Michael Atieh | 5,359 | $ 19,453 | $ 39,496 | $ 10,718 | 8,671 | $ 95,381 | $ 17,342 | $ 134,877 | 28,060 |
| Ali Behbahani, M.D. | 5,359 | $ 19,453 | $ 39,496 | $ 10,718 | 3,573 | $ 39,303 | $ 7,146 | $ 78,799 | 17,864 |
| George Eliades, Ph.D. | 5,359 | $ 19,453 | $ 39,496 | $ 10,718 | 16,863 | $ 185,493 | $ 33,726 | $ 224,989 | 44,444 |
| Mark Murray | 185,635 | $ 473,851 | $1,568,134 | $ 371,270 | 3,573 | $ 39,303 | $ 7,146 | $1,607,437 | 378,416 |
| Clare Ozawa, Ph.D. | 5,359 | $ 19,453 | $ 39,496 | $ 10,718 | 3,573 | $ 39,303 | $ 7,146 | $ 78,799 | 17,864 |
| Donald Santel | 5,359 | $ 19,453 | $ 39,496 | $ 10,718 | 8,198 | $ 90,178 | $ 16,396 | $ 129,674 | 27,114 |
| Benjamin Tsai | 5,359 | $ 19,453 | $ 39,496 | $ 10,718 | 3,573 | $ 39,303 | $ 7,146 | $ 78,799 | 17,864 |
| Aimee Weisner | 5,359 | $ 19,453 | $ 39,496 | $ 10,718 | 3,573 | $ 39,303 | $ 7,146 | $ 78,799 | 17,864 |

| Name | Shares underlying Rollover Oyster Point Options (#) | Shares Underlying Unvested Oyster Point RSUs (#)[1] | Shares Underlying Oyster Point PSUs (#)[2] | Shares Underlying Specified RSU/PSU Awards (#)[3] |
|---|---|---|---|---|
| Jeffrey Nau, Ph.D., M.M.S., Chief Executive Officer | 38,721 | 47,974 | 170,600 | 350,000 |
| Daniel Lochner, Chief Financial Officer | 33,657 | 20,236 | 80,000 | 300,000 |

41.     In addition, certain employment agreements with certain Oyster Point executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff. The Recommendation Statement fails to disclose these payments.

42.     The Recommendation Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

43.     Thus, while the Proposed Transaction is not in the best interests of Oyster Point, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Recommendation Statement***

44.     On December 1, 2022, the Oyster Point Board caused to be filed with the SEC a materially misleading and incomplete Recommendation Statement, that in violation the Exchange Act, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

_Omissions and/or Material Misrepresentations Concerning the Sales Process leading up_

_to the Proposed Transaction_

45.     Specifically, the Recommendation Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Recommendation Statement fails to disclose:

a.   Adequate information as to whether a committee of disinterested directors was appointed to lead the sales process and if so, the powers to which they were authorized in reference to any proposed transaction;

b.   Adequate information why the board agreed to an uncertain form of consideration through a CVR rather than a more definite form of consideration;

c.   Adequate information as to why no "majority-of-the-minority" provision or other protections were implemented to protect the interests of the Company's public stockholders;

d.   Whether the terms of any confidentiality agreements entered during the sales process between Oyster Point on the one hand, and any other third party (including Viatris), if any, on the other hand, differed from one another, and if so, in what way;

e.   All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and potentially interested third parties (including Viatris) throughout the sales process, if any, would fall away; and

f.   The Recommendation Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

*Omissions and/or Material Misrepresentations Concerning Oyster Point's Financial Projections*

46. The Recommendation Statement fails to provide material information concerning financial projections for Oyster Point provided by Oyster Point management and relied upon by Centerview in its analyses. The Recommendation Statement discloses management-prepared financial projections for the Company which are materially misleading.

47. Notably, in connection with its fairness opinion rendered to the Company Board regarding the Proposed Transaction, Centerview notes that it reviewed, "certain internal information relating to the business, operations, earnings, cash flow, assets, liabilities and prospects of Oyster Point."

48. The Recommendation Statement, therefore, should have, but fails to provide, certain information in the projections that Oyster Point management provided to the Board and Centerview. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

49. With regard to *Oyster Point Projections - Five-Year Projections* prepared by Oyster Point management, the Recommendation Statement fails to disclose material line items for all projection metrics utilized in Centerview analyses:

  a. Net DED Revenue, including all underlying inputs, metrics, and assumptions

used to calculate this metric, including specifically: projected net product sales and milestone payments related to TYRVAYA Nasal Spray, projected net product sales and milestone payments related to OC-01 Neurotrophic Keratopathy indication ("OC-01 NK"), and projected net product sales related to Oyster Point's proprietary ETFTM gene therapy candidates, OC-101 (AAV-NGF) and OC-103 (AAV-DAO), the inputs metrics and assumptions used to determine a 65% probability of successful regulatory approval for OC-01 Neurotrophic Keratopathy indication, and the inputs metrics and assumptions used to determine a 5% probability of successful regulatory approval for OC-101 (AAV-NGF) and OC-103 (AAV-DAO);

b. Net NK Revenue, including all underlying inputs, metrics, and assumptions used to calculate this metric, including specifically: projected net product sales and milestone payments related to TYRVAYA Nasal Spray, projected net product sales and milestone payments related to OC-01 Neurotrophic Keratopathy indication ("OC-01 NK"), and projected net product sales related to Oyster Point's proprietary ETFTM gene therapy candidates, OC-101 (AAV-NGF) and OC-103 (AAV-DAO), the inputs metrics and assumptions used to determine a 65% probability of successful regulatory approval for OC-01 Neurotrophic Keratopathy indication, and the inputs metrics and assumptions used to determine a 5% probability of successful regulatory approval for OC-101 (AAV-NGF) and OC-103 (AAV-DAO); and

c. OC-101 and OC-103 U.S. Revenue, including all underlying inputs, metrics, and assumptions used to calculate this metric, including specifically: projected

net product sales and milestone payments related to TYRVAYA Nasal Spray, projected net product sales and milestone payments related to OC-01 Neurotrophic Keratopathy indication ("OC-01 NK"), and projected net product sales related to Oyster Point's proprietary ETFTM gene therapy candidates, OC-101 (AAV-NGF) and OC-103 (AAV-DAO), the inputs metrics and assumptions used to determine a 65% probability of successful regulatory approval for OC-01 Neurotrophic Keratopathy indication, and the inputs metrics and assumptions used to determine a 5% probability of successful regulatory approval for OC-101 (AAV-NGF) and OC-103 (AAV-DAO);

d.   Net Royalty / Milestone Revenue, including all underlying inputs, metrics, and assumptions used to calculate this metric, including specifically: projected net milestone and royalty payments related to ex-U.S. licensing transactions for TYRVAYA Nasal Spray, and (ii) projected net milestone and royalty payments related to ex-U.S. licensing transactions for OC-01 NK;

e.   Total Net Revenue, including all underlying inputs, metrics, and assumptions used to calculate this metric, including specifically: projected net product sales and milestone payments related to TYRVAYA Nasal Spray, projected net product sales and milestone payments related to OC-01 Neurotrophic Keratopathy indication ("OC-01 NK"), and projected net product sales related to Oyster Point's proprietary ETFTM gene therapy candidates, OC-101 (AAV-NGF) and OC-103 (AAV-DAO), the inputs metrics and assumptions used to determine a 65% probability of successful regulatory approval for OC-01 Neurotrophic Keratopathy indication, and the inputs metrics and assumptions

used to determine a 5% probability of successful regulatory approval for OC-101 (AAV-NGF) and OC-103 (AAV-DAO);

    f.   Operating Income, including all underlying inputs, metrics, and assumptions used to calculate this metric, including specifically: projected net product sales and milestone payments related to TYRVAYA Nasal Spray, projected net product sales and milestone payments related to OC-01 Neurotrophic Keratopathy indication ("OC-01 NK"), and projected net product sales related to Oyster Point's proprietary ETFTM gene therapy candidates, OC-101 (AAV-NGF) and OC-103 (AAV-DAO), the inputs metrics and assumptions used to determine a 65% probability of successful regulatory approval for OC-01 Neurotrophic Keratopathy indication, and the inputs metrics and assumptions used to determine a 5% probability of successful regulatory approval for OC-101 (AAV-NGF) and OC-103 (AAV-DAO);

    g.   Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions used to calculate this metric.

50.    Moreover, the Recommendation Statement fails to disclose the inputs and assumptions used to determine the CVR Probabilities, including specifically the bases for determining: (i) a 50% probability that neither of the Milestones will be achieved; (ii) a 45% probability that Milestone One will be achieved; and (ii) a 5% probability that Milestone Two will be achieved

51.    The Recommendation Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

52.     This information is necessary to provide Plaintiff in his capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

53.     Without accurate projection data presented in the Recommendation Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of Centerview's financial analyses, or make an informed decision whether to tender his shares in favor of the Proposed Transaction.  As such, the Board is in violation of the Exchange Act by failing to include such information in the Recommendation Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Centerview*

54.     In the Recommendation Statement, Centerview describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

55.     With respect to the *Analysis of Consideration*, the Recommendation Statement fails to disclose the following:

    a.  The inputs metrics and assumptions used to determine the likelihood of success of the Milestones in the CVR agreement;

56.     With respect to the *Selected Public Companies Analysis*, the Recommendation Statement fails to disclose the following:

    a.  The inputs, metrics, and assumptions used to determine a reference range of

EV/2023E Revenue Trading Multiples of 1.5x to 3.0x;

b.  The value of change of control payments and prepayment penalties under Oyster Point's outstanding term loan payable in connection with the Transaction; and

c.  The number of fully diluted outstanding shares of Company common stock as of November 4, 2022.

57.  With respect to the *Selected Transactions Analysis*, the Recommendation Statement fails to disclose the following:

a.  The specific date on which each transaction compared closed;

b.  The value of each transaction compared; and

c.  The number of fully diluted outstanding shares of Company stock;

d.  The inputs, metrics, and assumptions used to determine a reference range of EV / NTM Forward Revenue Multiples of 4.0x to 7.5x;

e.  The value of change of control payments and prepayment penalties under Oyster Point's outstanding term loan payable in connection with the Transaction; and

f.  The number of fully diluted outstanding shares of Company common stock as of November 4, 2022.

58.  With respect to the *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the following:

a.  The specific inputs and assumptions used to determine a discount rates ranging from 14.5% to 17.5%;

b.  The Company's weighted average cost of capital;

    c.   The implied terminal value calculated;

    d.   The inputs, metrics and assumptions used to determine a perpetuity growth rate of (50%);

    e.   The value of change of control payments and prepayment penalties under Oyster Point's outstanding term loan payable in connection with the Transaction; and

    f.   The number of fully diluted outstanding shares of Company common stock as of November 4, 2022.

59.    With respect to the *Analyst Price Target Analysis*, the Recommendation Statement fails to disclose the following:

    a.   The specific Wall Street analyst estimate consulted; and

    b.   The identity of the author and the firm that created the estimate consulted.

60.    With respect to the *Precedent Premiums Paid Analysis*, the Recommendation Statement fails to disclose the following:

    a.   The exact value of each transaction compared;

    b.   The date on which each transaction compared closed; and

    c.   The underlying inputs, metrics, and assumptions used to determine the selected a range of premiums of 30% to 50%.

61.    These disclosures are critical for Plaintiff to be able to make an informed decision on whether to tender his shares in favor of the Proposed Transaction.

62.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder.  Moreover, without the key financial information and

related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Oyster Point stockholder.   As such, the Board has violated the Exchange Act by failing to include such information in the Recommendation Statement.

**FIRST COUNT**

**Violations of Section 14(e) of the Exchange Act**

**<u>(Against All Defendants)</u>**

63.     Plaintiff repeats all previous allegations as if set forth in full herein.

64.     Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders, including Plaintiff, to tender their shares in favor of the Proposed Transaction.

65.     Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]

66.     The Recommendation Statement was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above.   Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

67.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

68.     The Individual Defendants were at least negligent in filing a Recommendation Statement that was materially misleading and/or omitted material facts necessary to make the Recommendation Statement not misleading.

69.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to tender its shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

70.     Plaintiff has no adequate remedy at law.

## SECOND COUNT

### Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9

### (Against all Individual Defendants)

71.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

72.     Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders, including Plaintiff, to tender their shares in favor of the Proposed Transaction.

73.     Section 14(d)(4) requires Defendants to make full and complete disclosure in connection with a tender offer.

74.     SEC Rule 14d-9 requires a Company's directors to, furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

75.     Here, the Recommendation Statement violates both Section 14(d)(4) and SEC Rule 14d-9 because it because it is materially misleading in numerous respects, omits material facts,

including those set forth above and Defendants knowingly or recklessly omitted the material facts from the Recommendation Statement.

76.   The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to tender his shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

77.   Plaintiff has no adequate remedy at law.

## THIRD COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

78.   Plaintiff repeats all previous allegations as if set forth in full herein.

79.   The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Registration Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

80.   The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Registration Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The

Individual Defendants were able to, and did, control the contents of the Registration Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Registration Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

81.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Oyster Point's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Registration Statement was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Registration Statement and are therefore responsible and liable for the misrepresentations contained herein.

82.     The Individual Defendants acted as controlling persons of Oyster Point within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Oyster Point to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Oyster Point and all of its employees.  As alleged above, Oyster Point is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A.     Enjoining the Proposed Transaction;

B.     In the event Defendants consummate the Proposed Transaction, rescinding it and

setting it aside or awarding rescissory damages to Plaintiff;

C.     Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: December 5, 2022                  **BRODSKY SMITH, LLC**

                              By:   */s/ Evan J. Smith*
                                    Evan J. Smith (SBN 021271996)
                                    emith@brodskysmith.com
                                    Ryan P. Cardona (SBN 093162013)
                                    rcardona@brodskysmith.com
                                    1310 Kings Highway N.
                                    Cherry Hill, NJ 08034
                                    Tel.:   (856) 795-7250
                                    Fax:    (856) 795-1799

                                    *Counsel for Plaintiff*